PETITION OF MATTHEW HIGH PINE et al.

(99 N.W.2d 38)

(File No. 9708. Opinion filed November 2, 1959)

**Parnell J. Donohue,** Atty. Gen., **Wallace G. Dunker, Marshall M. Gerken,** Asst. Attys. Gen. **John C. Farrar,** Rapid City, of counsel, for Appellant.

**Hanley, Costello & Porter,** Rapid City, **Richard Schifter,** Washington, D.C., of counsel, for Respondent.

SMITH, J.   A justice of the peace of Shannon County convicted the above named defendant Woman Dress of a charge of public intoxication, committed in said county "on a public highway" and imposed a ten-day jail sentence. In this proceeding in habeas corpus Woman Dress questioned the jurisdiction of the justice of the peace. At the hearing it was stipulated that Woman Dress is a member of the Oglala Sioux Tribe, and that the offense was committed on a north and south street or road which forms a street in the Pine Ridge Reserve and on a part of the Pine Ridge Indian Reservation. Shannon County is within the exterior boundaries of that Reservation. The trial court held the justice of peace to be without jurisdiction and discharged the defendant from the custody of the sheriff of Shannon County. The sheriff has appealed.

Whether the State of South Dakota has jurisdiction to punish an Indian, a member of the Oglala Sioux Tribe, for intoxication in a public place within the boundaries of the Pine Ridge Reservation, is the principal question presented by this appeal.

The principles which must govern our decision have received authoritative review in the recent case of Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 270, 3 L.Ed.2d 251. In that decision the court first quoted the classic language of Chief Justice Marshall as follows:

"The Cherokee nation * * * is a distinct community occupying its own territory * * * in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States." (Worcester v. State of Georgia, 6 Pet. 515, 561, 8 L.Ed. 483).

Then the Williams opinion continues,

"Over the years this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy of Worcester has remained. Thus, suits by Indians against outsiders in state courts have been sanctioned. (Citations.) And state courts have been allowed to try non-Indians who committed crimes against each other on a reservation. (Citations.) **But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive.** Donnelly v. United States, 228 U.S. 243, 269-272, 33 S.Ct. 449, 458-459, 57 L.Ed. 820; Williams v. United States, 327 U.S. 711 66 S.Ct. 778, 90 L.Ed. 962. Essentially, absent governing acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them. Cf. Utah & Northern R. Co. v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542."

Continuing, the opinion reads:

> "Congress also has consistently acted upon the assumption that the States have no power to regulate the affairs of InIdians on a reservation. * * * Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantage to them. See H.R.Rep.No. 848, 83d Cong., 1st Sess. 3, 6, 7 (1953). **Significantly, when Congress has wished the States to exercise this power it has expressly granted them** the jurisdistion which Worcester v. State of Georgia has denied." Emphasis supplied.

It follows that warrant for the exhibited exercise of criminal jurisdiction by the justice of peace of Shannon County must arise from a grant of power by Congress. Cf. "Criminal Jurisdiction over Indian Country in Arizona", Vol. 1, No. 1, 1959 Arizona Law Rev. 63. The sheriff purports to find such a grant and acceparnce of jurisdiction in the legislation we are about to consider.

The Act of August 15, 1953, 67 Stat. 588, which extended the civil and criminal laws of California, Minnesota, Nebraska, Oregon and Wisconsin, 28 U.S.C.A. § 1360, 18 U.S.C.A. § 1162, with certain exceptions, to Indian country, included additional sections 28 U.S.C.A. § 1360 note, as follows:

> "Section 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: **Provided,** That the provisions of this Act shall not

become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

"Section 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

When the quoted federal provisions were enacted in 1953, there existed in South Dakota a provision of Ch. 187, Laws 1951, reading as follows:

"In the absence of treaty or statute of the United States, the state of South Dakota shall have jurisdiction to arrest, prosecute, convict, and punish any person committing any offense under the laws of the state of South Dakota on any Indian Reservation or in the Indian country."

It is the contention of the sheriff that the federal provisions, supra, in conjunction with the quoted existing statute of South Dakota, operated to extend the criminal jurisdiction and laws of our state to the Pine Ridge Reservation, and hence to sustain the challenged conviction. Analysis of the history and contents of these respective acts has induced the conclusion that such a result was not contemplated by either the Congress or the Legislature.

The report of the legislative history of the Act of August 15, 1953, 67 Stat. 588, supra, appearing in 2 U.S. Code Congressional and Administrative News, 1953, page 2409, reveals that while considering proposed legislation extending criminal laws of California to all Indian country within that state, the committee concluded that legislation in this area should be on a general basis, making provision for all affected states to come within its terms, and that

"the attitude of the various States and the Indian groups within those States on the jurisdiction transfer question should be heavily weighed before effecting transfer * * *." p. 2412. As a result of consultations with the authorities and Indian groups, the states of California, Minnesota, Nebraska, Oregon, and Wisconsin, excepting specified areas, were authorized to exercise such jurisdiction. Mention of South Dakota was made in the legislative reports in these words:

> "Examination of the Federal statutes and State constitutions has revealed that enabling acts for eight States, and in consequence the constitutions of those States, contain express disclaimers of jurisdiction. Included are Arizona, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, and Washington. Effect of the disclaimer of jurisdiction over Indian land within the borders of these States—in the absence of consent being given for future action to assume jurisdiction—is to retain exclusive Federal jurisdiction until Indian title in such lands is extinguished; such States could, under the bill as reported, proceed to amendment of their respective organic laws by proper amending procedure."

Further mention of South Dakota is made in a report of the Department of Interior, included in the legislative history, in these words:

> "The Bureau of Indian Affairs has consulted with State and local authorities and Indian groups only in the States mentioned above. However, we have other information which indicates that State authorities in Montana and South Dakota would be agreeable to transfer of jurisdiction if such transfer were accomplished by a complete Federal subsidy. The Indians in these two States have indicated their unanimous opposition to the extension of State laws on their reservations."

As we read the history and content of the cited Federal Act, it was not intended as a present grant of

power. Rather the act contemplates something in the nature of a compact between the Federal Government and each accepting state respectively; it offers a grant of power to any state which would indicate its acceptance of that offer through appropriate future action. Cf. Kills Plenty v. United States, 8 Cir., 133 F.2d 292, at page 293. The act was so interpreted by our Legislature. In tendering a conditional acceptance by Ch. 319, Laws 1957, it used these words in section 1 thereof: "In accordance with the provisions of 67 statutes at large, page 589, Public Law 280, and as Indian Country is defined by Title 18 U.S.C.A., Section 1151, the provisions of Chapter 106 of the Session Laws of the State of South Dakota for 1901, as amended, or any law to the contrary, notwithstanding, the state of South Dakota assumes and accepts jurisdiction of all criminal and civil causes of action arising in Indian Country under the provisions of this Act as hereinafter set forth." We digress to observe that the conditions imposed by the terms of this acceptance have not been performed.

Ch. 187, Laws 1951 of South Dakota, embracing the paragraph quoted supra, upon which the sheriff grounds his contention, has a background which should be outlined. As stated in Williams v. Lee, supra, it had been declared by the supreme court that states had a limited jurisdiction to punish offenses committed within Indian reservations. For instance, it had been held that the states had jurisdiction to punish crimes committed by non-Indians against non-Indians within a reservation. United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869; and Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419. South Dakota, because of lack revenue from its reservations, found even such limited jurisdiction burdensome, and by Ch. 106, Laws 1901, relinquished and gave to the United States "excluseve jurisdiction and authority to arrest, prosecute, convict and punish **all persons** whomsoever who shall, upon any Indian reservation within the state of South Dakota, commit any act in violation of the penal laws of the United States." See United States v. Frank Black Spotted Horse, D.C., 282 F. 349, at page 351. However, in responding to that tender of jurisdiction the United States only clothed its circuit and district courts with

power to punish certain named major crimes. Cf. Act of February 2, 1903, 32 Stat. 793, 18 U.S.C.A. §§ 1151, 1153. These powers were exercised by the Federal courts for many years. In October 1949 this court filed its opinion in State ex rel. Olson v. Shoemaker, 73 S.D. 120, 39 N.W.2d 524, in which it held that by the 1948 revision of the Federal statutes on Crimes and Criminal Procedure appearing as new Title 18 U.S.C.A. the Congress intended to relinquish the criminal jurisdiction assumed by 32 Stat. 793, supra. The next session of our Legislature· enacted Ch. 187, Laws 1951. By the second paragraph of that act South Dakota accepted the relinquishment by the United States of the criminal jurisdiction it had assumed by cession from South Dakota as above described, and by the third paragraph it was declared, as quoted supra, "In the absence of treaty or statute of the United States, the state of South Dakota shall have jurisdiction to arrest, prosecute, convict and punish any person committing any offense under the laws of the state of South Dakota on any Indian Reservation or in the Indian country." It seems apparent to us that the described and quoted paragraphs of Ch. 187, Laws 1951, were intended to accomplish no more than to remove any uncertainty existing by reason of the cession of jurisdiction by South Dakota to the United States by (1) expressly accepting the relinquishment by the United States of so much jurisdiction as it had actually assumed in response to that cession and (2) reasserting and reaffirming, in terms equally as sweeping as those employed in its act of cession, the power of our courts to exercise the full measure of their actual jurisdiction within the areas of our Indian reservations. Because, as is made to appear by the passages we have quoted from Williams v. Lee, supra, South Dakota was then without power to extend its criminal jurisdiction to tribal Indians within its Indian reservations, and as is indicated by the history recounted in 2 U.S. Cong. News, '53, supra, Congress had not theretofore offered to so extend the criminal jurisdiction of South Dakota, it is inconceivable that in 1951, by the quoted general terms employed in the cited legislative act of that year, the Legislature intended to attempt to declare or create such a special jurisdiction. And it seems equally unreasonable to believe

it then intended to offer to assume that jurisdiction at any time in the unlimited future at the pleasure of the Congress. The assumption of jurisdiction over all crimes committed by tribal Indians within the Indian reservations of South Dakota involves no inconsiderable financial burdens for the affected counties. That our Legislature is aware of the magnitude of that burden is indicated by the fact that in Ch. 319, Laws 1957, it insisted upon a Federal subsidy for the benefit of those counties as a condition to its acceptance of such a jurisdiction. To yield to the advocacy of the sheriff would be to charge the Legislature with indulging in the useless act of agreeing, by Ch. 319, Laws 1957, to conditionally accept that, which according to his view, it had theretofore acquired under its earlier unconditional offer of 1951.

As we have stated, we deem the sheriff's contention untenable.

Appellant's brief advances contentions which were not presented and considered below. Under settled principles those contentions are not before us. Gaines v. White, 2 S.D. 410, 50 N.W. 901; Utah Idaho Sugar Co. v. Temmey, 68 S.D. 623, 5 N.W.2d 486; and 39 C.J.S. Habeas Corpus § 113, p. 715.

The order and judgment is affirmed.

All the Judges concur.