**UNITED STATES of America,**
**Appellee,**

v.

**Martin Dewalt MAZURIE et al.,**
**Appellants.**

**Nos. 73–1077 to 73–1079.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 11, 1973.

Decided Nov. 8, 1973.

Certiorari Granted Feb. 25, 1974.
See 94 S.Ct. 1468.

---

Charles E. Hamilton, Riverton, Wyo., for appellants.

Lawrence E. Shearer, Atty., Dept. of Justice (Wallace H. Johnson, Asst. Atty. Gen., Richard V. Thomas, U. S. Atty., Edmund B. Clark, and Jacques B. Gelin, Attys., Dept. of Justice, with him on the brief), for appellee.

Marvin J. Sonosky and Glen A. Wilkinson, Washington, D. C., on the brief for amicus curiae, Shoshone Indian Tribe and Arapahoe Indian Tribe.

Before LEWIS, Chief Judge, and SETH and HOLLOWAY, Circuit Judges.

SETH, Circuit Judge.

The appellants were prosecuted on an information charging them with the introduction of liquor into "Indian Country." They were tried by the court, found guilty of a violation of 18 U.S.C. § 1154, and have taken this appeal.

The prosecution was instituted because the defendants did not have a license for their tavern from the Arapahoe and Shoshone Indian Tribes (the Wind River Tribes), permitting the sale of liquor. The tavern of defendants where the charged offense took place is located on land owned in fee by them, but within the boundaries of the Wind River Indian Reservation. The business was licensed under the laws of Wyoming by Fremont County, and had been so operating since 1954. The appellants are not Indians.

The Wind River Tribes in 1953 adopted a regulation which permitted the sale of liquor within the Reservation if it was done in accordance with Wyoming law with no additional requirements. In 1971, however, the Tribes adopted a new regulation which required persons in defendants' position to also obtain a license from the Tribes. The defendants at the time of the charged offenses did not have such a license, and this the Government asserts was contrary to 18 U.S.C. § 1161, which section in effect requires such a tribal license to avoid a violation of 18 U.S.C. § 1154 if the sale of liquor is in "Indian Country," and under "jurisdiction" of the Tribe, and not in a "non-Indian community" as the terms appear in 18 U.S.C. § 1154(c). Thus the issues on appeal relate to these exceptions or conditions provided in 18 U.S.C. § 1154(c); to the provisions for tribal licensing in 18 U.S.C. § 1161; and to the application of those provisions to a business on lands patented by the United States to defendants' predecessors in fee.

The Wind River Reservation covers a gross area of something more than one hundred townships and is roughly in the form of a square. Within the boundaries is the town of Riverton, Wyoming, and several small communities. About 4,500 Indians live on the Reservation, that is, persons who are enrolled by the Tribes as members. The Reservation is crossed by two or three principal highways. There are several hundred separate tracts of fee land within the boundaries which in total area would be roughly one-fifth of the Reservation. Some of these fee tracts consist of twenty or thirty contiguous sections or more, and some are just a few acres. The balance of the acreage consists of trust

lands, some Indian allotments, and large tracts of Government land. The Reservation is occupied by the Shoshone and Arapahoe Tribes who have beneficial title. See Shoshone Tribe v. United States, 299 U.S. 476, 57 S.Ct. 45, 81 L. Ed. 390.

The appellants' tavern is located within the exterior boundaries of the Reservation on a small tract of land patented in fee by the United States in 1954 under 24 Stat. 390 and 34 Stat. 182 to appellants' predecessors. The patent contains no restrictions as to the use to which the land may be put. The land is taxed by the State of Wyoming, and the state provides the usual public services for it. It is in a Fremont County School District which provides schools for the area, and on a county road.

There is no issue as to the presence of liquor at the tavern which was the incident on which the "introduction" count of the information was based.

There are several interrelated conditions and definitions, referred to above, which must be established under the several sections of the statute for there to be a violation. For example, the place where the sale took place must be in "Indian Country," under 18 U.S.C. §§ 1154 and 1161, but *not* on "fee-patented" land in "non-Indian communities." Also the sale must *not* be in "conformity" with state laws *and* tribal regulations of the Tribe "having jurisdiction" over the area of Indian country. 18 U.S.C. § 1161. These definitions or requirements must be examined as a part of the crime charged.

We are thus concerned with the elements of this crime, and not the frequently encountered question of whether state or federal *jurisdiction* exists over certain crimes which is determined by the place where they were committed. 18 U.S.C. §§ 1151, 1152, 1153. Instead the geographical-land status terms and the substance and effect of tribal regulations thus become part of the elements of a crime, and if not shown the act was a legal one.

The type of business engaged in by the appellants is what has now become a regulated retail business which has been legalized by the United States and licensed under the laws of the State of Wyoming. Thus the selling of liquor to Indians at a tavern licensed by the state is, of course, not a federal crime per se, but can become one under certain conditions, the definition of which, and the problem of proof of the existence of which, are hereinafter described.

The first consideration must be given to the term "non-Indian community" as used in 18 U.S.C. § 1154(c). This subsection was added by the Act of May 24, 1949, § 27(b). See U.S.Code Cong. Service, 1949, p. 1248. The reported congressional history does not provide much help in arriving at the intended construction of the term.

18 U.S.C. § 1154 provides in part:

"(a) . . . . [W]hoever introduces . . . any . . . spiritous, or vinous liquor, including beer, . . . into the Indian country, shall, . . . be fined . . . .

. . . . . . .

"(c) The term 'Indian country' as used in this section does not include fee-patented lands in non-Indian communities or rights-of-way through Indian reservations, and this section does not apply to such lands or rights-of-way in the absence of a treaty or statute extending the Indian liquor laws thereto. June 25, 1948, c. 645, 62 Stat. 758; May 24, 1949, c. 139, § 27, 63 Stat. 94."

18 U.S.C. § 1161 provides:

"The provisions of sections 1154, 1156, 3113, 3488, and 3618, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secre-

tary of the Interior, and published in the Federal Register. (Added Aug. 15, 1953, ch. 502, § 2, 67 Stat. 586.)"

The basic statute (18 U.S.C. § 1154) originally made it a crime to sell liquor to certain Indians at any location, or to introduce liquor into "Indian Country." By subsection (c), it was then provided that "Indian Country" as used in the section ". . . does not include fee-patented lands in non-Indian communities. . . ." Thus if it is assumed for the moment that the fee land in question is in "Indian Country," generally, the question whether the particular place was also in a "non-Indian community" must be resolved if it can be. If the tavern was in a "non-Indian community" in "Indian Country," no crime was committed. The statute does *not* refer to "Indian communities" nor to non-communities.

The proof in the record herein of this element of the crime is inconclusive and indefinite. It showed that the tavern was located from one-half to three-quarters of a mile from the Reservation headquarters at Fort Washakie where there were located about eight business places. In the twenty square mile area surrounding the agency, it was estimated there were 170 Indian families and forty-one non-Indian families. The witnesses called by the Government were unable to define any boundaries of Fort Washakie. Mr. Harris, Chairman of the Shoshone Business Council, testified that the place in issue was not an "Indian community." The Reservation Superintendent testified there were no community boundaries which could be defined, and he could not testify that the location was in an Indian community. An examination of the record on this issue demonstrates that the inability of the witnesses to testify with specificity stems from the lack of any standards or any definition for the term. It was not clear to the witnesses what a "community" was, nor what was meant by "non-Indian." All that the proof shows was that the location was probably not in an Indian community; however, the statute refers only to "non-Indian communities."

The term "non-Indian community" could apply to towns such as Riverton, which is located within the exterior boundaries of the Wind River Reservation, and perhaps to other smaller settlements along the highways, but when the specific place here concerned is considered the problem is apparent. There is no standard provided as to what percentage of Indians or non-Indians is contemplated. Thus if a given area can be selected as a "community," the statute does not indicate that if there are more Indians than non-Indians, it becomes an Indian community, or what the "community" is if there are a greater or lesser comparative number of Indians. The Act also does not state who is an Indian. There are acts for other purposes which use twenty-five per cent Indian blood as the standard; others leave the test up to the Tribe concerned. Thus perhaps tribal membership is the test. However, if the twenty-five per cent test is used, individuals who are seventy-five per cent non-Indian could be counted to make up an "Indian" community, but in any event there is no guide as to this whatsoever.

It is also apparent that what constitutes a "community" for this purpose is not defined nor can it be clearly ascertained. In an area where the defendants' business was located, there were apparently some few scattered houses, although the record is not clear, but the witnesses did not have any standard on which to base their testimony. As mentioned, the nearby Fort Washakie had no definable boundaries, if it was a community, and the witnesses thus could not testify whether the bar was in it or not. There was thus no proof as to whether it was in a community or not in one, or if in one, what kind. Again, the proof failed because the statute contains no reasonably ascertainable standards.

Under these indefinite and vague conditions, the business generally, or isolated transactions legal under state law, could be either a federal crime or

perfectly legal. We must hold that the terminology of "non-Indian community" is not capable of sufficiently precise definition to serve as an element of the crime herein considered, aside from other factors or elements with similar infirmities. The statute is thus fatally defective by reason of this indefinite and vague terminology.

■ Vagueness in a non-First Amendment case has been considered by the Supreme Court in United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 and Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322. Under these standards the provision must not require persons of usual intelligence to guess as to its meaning nor differ as to its application. The vagueness issue was fully explored by the First Circuit in Goguen v. Smith, 471 F.2d 88 (1st Cir.). The statute here concerned is an isolated one, and not part of a general regulatory plan. It was applied in the trial court, and here urged by the Government, as containing a requirement (being in a non-Indian community) to be demonstrated at trial by the defendants. The placing of such a burden on defendants was improper. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931.

The Supreme Court in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, considered the question as to whether a charge of burglary against an Indian could be prosecuted by state or federal authorities. Here again a crime covered by 18 U.S.C. § 1152 in Indian country (section 1151) was considered. The location where the crime took place was fixed, and it was on privately owned land, but the Court reaffirmed the broad interpretation of Indian country, and mentioned the problems under section 1152 if the law enforcement officials had to search the tract books to decide whether jurisdiction over a particular crime was in the state or the United States. See also the checkerboard land status cases, Ellis v. Page, 351 F.2d 250 (10th Cir.); Hilder-

brand v. Taylor, 327 F.2d 205 (10th Cir.), and Martinez v. Southern Ute Tribe, 249 F.2d 915 (10th Cir.). Under this record this problem of law enforcement is not serious as the officers have dual authority; however, this is not the type of crime, nor a crime committed by an Indian, which we are considering. There is no policy or need for a broad interpretation of "Indian Country," under these conditions. There is instead a fixed place of business, the crime charged is against non-Indians, and the question is whether additional licensing was required. We do not reach the question as to whether the definition of "Indian Country" in 18 U.S.C. § 1151 is applicable only to the ten major crimes, as defendant urges, or is applicable to other transactions, as the Government contends.

■ The issue is also raised on the fundamental question of the authority of the Government or of the Tribes to regulate the defendants' business in a way that a failure to conform constitutes a crime. As indicated above, we are concerned with a business operating at a fixed place and legal under Wyoming laws. This business would have also been legal, under the Government's theory, if defendants had a license from the Wind River Tribes. The failure to have such a license thus resulted in this prosecution. The Government has thus delegated to the Tribes the unrestricted power to determine whether the operation of defendants' business constitutes a federal crime or not. Whatever regulation the Tribe adopts is enforced under the wording of the statute (18 U.S. C. § 1161), and any non-conformity therewith to whatever degree is a criminal offense.

If the Government has the power to regulate a business on the land it granted in fee without restrictions, which we doubt, it cannot delegate the power above described to the Tribes. There is no theory of sovereignty or governmental subdivision which would support such a delegation.

The Tribes have the usual powers of an owner of land, to the extent of such ownership, over those using their lands. This power is often confused with some elements of sovereignty when large tracts are involved, and when only the relationship between a Tribe and the Government is examined. The decisions relating to the sovereignty of certain tribes are in the context of relationships between a Tribe and the federal or state government. This relationship is influenced and derived from treaties, and relates to lands and taxes. See United States v. Mason, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22; McClanahan v. Arizona Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129; Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 115.

The Arapahoe and Shoshone Tribes are very important organizations which exercise a broad tribal authority over their members. They also exercise authority as would owners of large tracts of land. Their membership is limited to persons of a certain parentage or lineage as determined from time to time by the respective Tribes or by custom. Others are excluded. The membership can be described as voluntary, and the record indicates that a person with at least twenty-five per cent Arapahoe blood could be enrolled as a member of such Tribe, and the same for the Shoshone Tribe.

The tribal members are citizens of the United States. It is difficult to see how such an association of citizens could exercise any degree of governmental authority or sovereignty over other citizens who do not belong, and who cannot participate in any way in the tribunal organization. The situation is in no way comparable to a city, county, or special district under state laws. There cannot be such a separate "nation" of United States citizens within the boundaries of the United States which has any authority, other than as landowners, over individuals who are excluded as members.

The authority in the custom-usage sphere over members is, of course, another matter. The Government cites Iron Crow v. Oglala Sioux Tribe, 231 F. 2d 89 (8th Cir.), as authority for a general power to supervise business on the Reservation. We do not consider the case to so hold; instead it is authority for the assertion of tribal authority over members of the Tribe and this only.

The purported delegation of authority to the tribal officials contained in 18 U.S.C. § 1161 is therefore invalid. Congress cannot delegate its authority to a private, voluntary organization, which is obviously not a governmental agency, to regulate a business on privately owned lands, no matter where located. It is obvious that the authority of Congress under the Constitution to regulate commerce with Indian Tribes is broad, but it cannot encompass the relationships here concerned.

Under 18 U.S.C. § 1161, neither the lands in issue, nor the defendants, were under or within the "jurisdiction" of the Tribes.

The judgment is set aside and the case is reversed with instructions to dismiss each of the informations.