291 N.W.2d 278 (1980)
In the Matter of the GUARDIANSHIP OF D. L. L. and C. L. L., minors.
Martha Kay GUFFIN, Individually and in her capacity as Manager of the House of Shalom, a group foster home, Petitioner and Appellant,
v.
R. L., Sr. and K. L. on behalf of D. L. L. and C. L. L., Appellees, and
Lower Brule Sioux Tribe, Intervenor and Appellee.
No. 12854.
Supreme Court of South Dakota.
Argued February 21, 1980.
Decided April 9, 1980.
*280 Max A. Gors, of Maher & Gors, Pierre, for petitioner and appellant.
James L. Iosty, Tom Barnett and Anita Remerowski of South Dakota Legal Services, Fort Thompson, for appellees, parents of D.L.L. and C.L.L.
R. Dennis Ickes of Stringham, Larsen, Mazuran & Sabin, Salt Lake City, for intervenor and appellee; William J. Srstka, Jr. of Duncan Olinger, Srstka, Lovald & Robbennolt, Pierre, on brief.
DUNN, Justice.
Petitioner appeals from the order of dismissal of the proceedings and the denial of her petition for letters of guardianship. We affirm.
Appellees R.L. and K.L. (parents of D.L.L. and C.L.L.) are residents of the Lower Brule Sioux Indian Reservation and have five children. Each member of the family is a member of the Lower Brule Sioux Tribe. Petitioner operates the House of Shalom, a group foster home, in Presho, South Dakota.
In the late summer of 1976, Mr. L. was informed that an ulcer on his right foot would necessitate amputation of the leg at the hip. An informal arrangement was made to the effect that his two oldest childrenD.L.L. and C.L.L.would stay at petitioner's foster home during the 1976-77 school year. On November 26, 1976, the Lower Brule Sioux Tribal Court entered an order giving temporary custody of the four oldest children to petitioner at her foster home during the aforementioned school year. Petitioner and the parents were in agreement on this matter, and Mr. L. signed a document that stated that this arrangement was desired. Mr. L. anticipated a lengthy hospitalization at this time, and testimony in the lower court indicates that this factor was the prime motivation behind the grant of temporary custody. Petitioner desired the court to facilitate obtaining Bureau of Indian Affairs funds for the children's support.
When the court order expired, Mr. L. remained hospitalized and Mrs. L. was temporarily in California. Petitioner obtained another temporary custody order on June 27, 1977. The two younger children, however, returned to their home in Lower Brule during the summer without an authorizing court order. Mr. L. returned in late summer. On September 29, 1977, Mr. and Mrs. L. obtained a release order that terminated the temporary placement of the two younger children and returned them to their parents' custody. In this same release order, the Tribal Court provided for weekend visitations between the parents and their two older children, D.L.L. and C.L.L.
After some problems concerning alcohol consumption occurred during one of these visitation periods, petitioner obtained a Tribal Court order restricting visitation and requiring an order each time a visitation period was desired.
On March 9, 1979, petitioner informed the Tribal Court that D.L.L. was pregnant. Petitioner contends that the pregnancy was the result of an alleged rape by an unidentified party and that the rape occurred during a visitation period at Lower Brule during the Fourth of July holiday in 1978. Based upon the date of the birth of the child, the parents dispute that the alleged rape occurred during the July visitation. On March 16, 1979, the Tribal Court entered an order approving a visitation for the coming weekend. Petitioner did not obey the order. On March 22, the Tribal Court ordered that the children be returned to Lower Brule to reside in their parents' home until further order of the court. This order was not obeyed, and petitioner commenced the guardianship action that forms the basis of this appeal.
The trial court's dismissal of this action was based upon existing case law and the Indian Child Welfare Act of 1978. Petitioner contends that the 1978 Act unconstitutionally ceded the jurisdiction of South Dakota to the United States. It is true that a long line of United States Supreme Court cases, beginning with Barber v. Barber, 62 U.S. 582, 21 How. 582, 16 L.Ed. 226 (1859), holds that states have exclusive jurisdiction in domestic relations cases. Nevertheless, *281 Congress has seen fit to exercise its legislative will over Indian tribes and their members based upon Art. I, § 8, of the United States Constitution, which states: "The Congress shall have Power * * * [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." This section of the Constitution has been used many times as the basis of federal authority over Indian matters. McClanahan v. Arizona Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).
The Tenth Amendment, which reserves all nondelegated powers to the states or the people, has not been violated by the 1978 Act. The plenary power of Congress to legislate with respect to Indians is a deep-seated one. Such legislation does not infringe upon the Tenth Amendment as long as the legislative power is not exercised arbitrarily. No evidence has been introduced in support of an allegation of arbitrariness of the 1978 Act.
Likewise, petitioner's claim that the 1978 Act violates Article XXII of the South Dakota Constitution is unfounded. The United States has plenary power under the United States Constitution to govern tribal Indians. This power does not derive from a conveyance by South Dakota, and petitioner's claim that Article XXII reserves jurisdiction to the state whenever an Indian is off the reservation is incorrect. The proper inquiry is whether the actions of the state would infringe on the right of reservation Indians to make and be governed by their own laws. Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); Utah & Northern R. Co. v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542 (1885). Even when a tribal member is off the reservation, tribal courts provide the appropriate forum for settlement of disputes over personal and property interests of Indians that arise out of tribal relationships. Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); Williams v. Lee, supra. Indian relations are of an anomalous and complex character, and tribal courts are better able than other forums to evaluate questions of Indian traditions. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916). To justify the application of a state law affecting these relations there must be some clear provision to that effect. Quiver, 241 U.S. at 606, 36 S.Ct. at 700. It follows that when tribes have the power to make their own substantive law in internal matters they also have the power to enforce those laws in their own forums.
The fact that the children in this case spent some time off the reservation is not determinative of the proper forum. Even though a member of an Indian tribe may be outside the territorial boundaries of the reservation, the tribal government may regulate the absent member's affairs involving questions of membership, Roff v. Burney, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897), and questions of domestic relations, United States v. Quiver, supra. The locus of the act of a member is not conclusive. Rather, the test is a broader one, hinging on whether the matter demands exercise of the tribe's responsibility of self-government. Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); Littell v. Nakai, 344 F.2d 486 (9th Cir. 1965). There can be no greater threat to essential tribal relations and to the tribal power of self-government than to interfere in questions of custody of tribal members.
Petitioner argues that D.L.L. and C.L.L. are being denied equal protection and due process in violation of the Fifth Amendment. She claims that the denial of access to state court was based upon "invidious racial discrimination." This is incorrect. The denial of access to state court was based solely upon the political status of the parents and children and the quasi-sovereign nature of the tribe. This is a discriminatory classification which is not prohibited by the United States Constitution. Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976).
Petitioner argues that this dispute arises under § 101(b) of the 1978 Act as opposed to *282 § 101(a). She contends that the Tribal Court is divested of jurisdiction under § 101(b) because the state court proceeding was commenced within 180 days of the enactment of the 1978 Act. Section 113 of the Act explicitly provides that the 180-day limitation does not apply to § 101(a).
Section 101(a) states that an Indian tribe shall have exclusive jurisdiction
as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe * * *. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.
We find that these children were wards of the Tribal Court prior to the state court action. The Tribal Court acted upon a written request of the father to have the children placed in the temporary custody of the Tribal Court. This, in turn, enabled the Tribal Court to place the children with petitioner. It is not required that the court order specifically use the words "ward of the court" in order to effectuate such a status. In re Jennings, 68 Ill.2d 125, 11 Ill.Dec. 256, 368 N.E.2d 864 (1977). This order was of a continuing nature, not final when issued, and could be changed at an unspecified time in the future. The person to whom the order is referenced is a ward of the court. In re Wolfe, 91 Ohio L.Abst. 167, 187 N.E.2d 658 (1962). The only legal rights of the petitioner vis-a-vis the children were those outlined by the Tribal Court.
Furthermore, the children remained residents and domiciliaries of the reservation. The domicile of a minor child is the domicile of the parents until legally changed. State v. Prosser, 78 S.D. 35, 98 N.W.2d 329 (1959). The residence of the parents never changed. In State v. Prosser, we found that the child's domicile and residence had changed, but the child's parents had died and the child had been brought to this state by a natural guardian for permanent residence. In the instant case, the arrangement was accepted as temporary by all concerned.
Finally, the reservation residency and domicile of the children was not lost by any supposed abandonment or emancipation on the part of the parents. There was no express mutual agreement by the parents granting emancipation. Emancipation can be implied "when there has been complete abandonment of parental responsibility and control, and the child is actually obtaining support by other means * *." SDCL 25-5-19. In this case, the father foresaw a lengthy, expensive hospitalization and agreed, for the welfare of the children, to grant petitioner temporary custody. There is no evidence of "complete abandonment of parental responsibility and control." Likewise, there has been no desertion here. An involuntary, temporary inability to assume a parental role is not abandonment. In re Adoption of Christofferson, 89 S.D. 287, 232 N.W.2d 832 (1975). The personal health problems of the parents, whether physical or alcohol-related, do not show intent to abandon. If these problems of the parents are adversely affecting the welfare of the children, the proper forum for relief is the Tribal Court.
The order of the trial court is affirmed.
All the Justices concur.