Dolly Mae WELLS, Plaintiff
and Appellee,

v.

William W. WELLS, Defendant
and Appellant.

No. 16626.

Supreme Court of South Dakota.

Argued Oct. 16, 1989.
Decided Feb. 14, 1990.

William Taylor of Woods, Fuller, Shultz & Smith, P.C., Sioux Falls, for defendant and appellant.

Lawrence R. Bihlmeyer, Rapid City, for plaintiff and appellee.

SABERS, Justice.

William Wells appeals an order denying his motion to dismiss Dolly Wells' divorce action for lack of subject matter jurisdiction and lack of a case or controversy.

### Facts

William and Dolly, enrolled members of the Crow Creek Tribe, were married in Pierre, Hughes County, South Dakota in 1980. They lived together on the Crow Creek Reservation in Buffalo County until April of 1987 when Dolly left the reservation with their minor children. She eventually settled in Rapid City, Pennington County, South Dakota in July of that year.

As soon as Dolly left the reservation, William attempted to start a divorce action in the Crow Creek tribal court. However, the tribal code specified that to start a divorce action a copy of the summons and complaint "must be served personally" upon the defendant. Since William did not know where Dolly went after she left the reservation, he was unable to obtain service of process to begin his divorce action. Crow Creek tribal law does not provide for personal service by publication, as South Dakota law does. SDCL 15-9-7 and -8.

In August of 1987, Dolly started divorce proceedings against William in circuit court of Pennington County. As a result, William learned the identity of Dolly's attorney and attempted to obtain service of process on her by mailing a copy of the tribal court summons and complaint to her attorney. Dolly knew her attorney received these documents, but refused to sign an admission of personal service. Nevertheless, the tribal court judge accepted this as service of process, and on November 30, 1987, entered a default divorce decree in favor of William and awarded him custody of the children.

In September of 1987, service of process in the state court action was made on William by the Buffalo County sheriff while William was on the Crow Creek Reservation. William made a special appearance in that action and challenged, among other things, the sufficiency of the service of process. The circuit court dismissed the case for insufficient service of process because the sheriff of Buffalo County had no jurisdiction to effectuate service of process on an enrolled member of the Crow Creek tribe while the member was residing in and domiciled on the reservation.

In March of 1988, Dolly started new divorce proceedings in state court (again in Pennington County). This time service upon William was obtained by a tribal policeman whose return of service stated he was an enrolled member of the Crow Creek tribe. William again specially appeared and moved to dismiss the case, asserting two separate grounds for dismissal. First, the tribal court divorce decree had already dissolved the marriage so there was no longer a case or controversy, and second, the South Dakota court lacked subject matter jurisdiction over the parties. The circuit court judge rejected both arguments. He concluded that the South Dakota court had concurrent subject matter jurisdiction with the tribal court, and the tribal court divorce decree would not be recognized as a matter of comity because it failed to comply with SDCL 1–1–25, primarily due to the failure to personally serve Dolly in accordance with the tribal code. We granted William permission to appeal from the intermediate order, but we affirm the order of the circuit court.

## 1. *Recognition of tribal court divorce decree.*

William claims that the tribal court divorce decree has dissolved his marriage to Dolly, and under the principle of comity South Dakota courts must recognize that action of the tribal court. As a result, he claims no case or controversy remains for the circuit court to resolve.

■ South Dakota courts will recognize tribal court orders under the principle of comity, *State ex rel. Joseph v. Redwing*, 429 N.W.2d 49 (S.D.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2071, 104 L.Ed.2d 636 (1989), but the party seeking recognition must first establish that the tribal court order complies with SDCL 1–1–25. *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D. 1985). SDCL 1–1–25(1)(d) requires a showing by clear and convincing evidence that "[t]he order or judgment complies with the laws, ordinances and regulations of the jurisdiction from ˮwhich it was obtained[.]" Dolly claims the tribal court divorce decree failed to comply with tribal law because a copy of the summons and complaint was not "served personally upon [the] defendant," as required by tribal code § 04–04–05.

■ It is undisputed that Dolly never received or saw a copy of the summons and complaint in the tribal court divorce action. William claims that service of process was achieved by means of mailing a copy of the summons and complaint to Dolly's attorney. We disagree.

William offers no authority for his claim that mailing a copy of a summons and complaint to a party's attorney satisfies tribal code requirements for service of process. William merely contends that since the tribal judge accepted this means of service of process it must be in compliance with tribal law. He further argues that such service does not violate constitutional due process requirements. However, this is not a question of constitutional due process. This is simply a question of whether the requirements of tribal law have been

satisfied, and just because the tribal judge issued an order does not mean that the service of process was valid. It has long been recognized that a party has a "right collaterally to impeach a decree of divorce made in another state, by proof that the court had no jurisdiction[.]" *Williams v. State of North Carolina*, 325 U.S. 226, 229, 65 S.Ct. 1092, 1095, 89 L.Ed. 1577, 1581 (1945) (*Williams II*); *see also Underwriters Nat'l Assurance Co. v. North Carolina Life and Accident and Health Ins. Guar. Ass'n*, 455 U.S. 691, 705, 102 S.Ct. 1357, 1366, 71 L.Ed.2d 558, 570–71 (1982) ("[B]efore a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree.").

Since we are aware of no tribal authority regarding the definition of "served personally," we must use the plain meaning of the words within the context of the tribal code. We first note that Black's Law Dictionary lists service by mail as a form of substituted service which is defined as "any form of service of process other thàn personal service." Black's Law Dictionary 1228 (5th ed. 1979). In other words, when something must be served personally, generally it is insufficient to mail it.

We next look to the surrounding provisions of the tribal code for guidance in interpretation. Section 04–04–04 provides that a summons shall be "directed to a police officer with a command that he serve it." It is unlikely that a police officer would be directed to serve a summons if service by mail was sufficient. Section 04–04–05 provides that the summons must be served personally and if the defendant cannot be conveniently found, "[s]ervice may be made by leaving a copy of the summons and complaint at the ₐdefendant's usual abode with a resident of the household above the age of 14 years." This is the only alternate form of service allowed, yet it still suggests that the summons must be personally delivered. Finally, we note that Section 04–04–06 provides that the police officer is to return the summons with a signed statement that he had either served it or was unable to serve it. If service by mail were sufficient, the police officer would be unable to state one way or another whether the copy had actually been received by the defendant. Consequently, the requirement of § 04–04–06 would not make sense. Therefore, when the words "served personally" are given their plain meaning within their context, service by mail is insufficient to meet the requirements of the tribal code. The record does not reflect any other attempts to obtain personal service upon Dolly, such as through the use of the office of the Pennington County sheriff. William has failed to establish by clear and convincing evidence that the divorce decree complied with the laws of the Crow Creek tribe. As a result, we are unable to recognize the tribal court divorce decree.

### 2. *Subject matter jurisdiction.*

The South Dakota Legislature has granted circuit courts subject matter jurisdiction over actions for divorce. SDCL 16–6–9. This jurisdiction may extend to any marriage where one spouse is domiciled within the state. As explained by the United States Supreme Court in *Williams II:* "The domicil of one spouse within a State gives power to that State ... to dissolve a marriage wheresoever contracted." 325 U.S. at 229–30, 65 S.Ct. at 1095, 89 L.Ed. at 1581. *Accord Nelson v. Nelson*, 71 S.D. 342, 24 N.W.2d 327 (1946). A state where only one spouse is domiciled has this power because domicile creates a relationship with a state, and "[e]ach state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders." *Williams v. State of North Carolina*, 317 U.S. 287, 298, 63 S.Ct. 207, 213, 87 L.Ed. 279, 286 (1942) (*Williams I*); *see also Restatement (Second) of Conflict of Laws* § 71, comment a (1971) ("When the spouses have separate domicils, each state of domicil has an interest in their marriage status.").

■ William contends that even though Dolly is domiciled in the state of South Dakota, South Dakota's courts do not have jurisdiction over their marriage because of their status as enrolled members of the Crow Creek tribe. He argues that exercise

of jurisdiction over this marriage by a South Dakota court would infringe upon the sovereignty of the Crow Creek tribe.

The test for determining whether a state court may assume jurisdiction over claims involving Indians has been set forth in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (*Lee*): "the question has always been whether the state action [would infringe] on the right of reservation Indians to make their own laws and be ruled by them." *Id.*, 358 U.S. at 220, 79 S.Ct. at 271, 3 L.Ed.2d at 254; *accord In re Guardianship of D.L.L. and C.L.L.*, 291 N.W.2d 278, 281 (S.D.1980).

In applying the *Lee* infringement test to this case, we first note that *Lee* concerned a single transaction that occurred on the reservation. In such a situation, it is only appropriate that tribal law and tribal courts govern. In contrast, Indians that go "beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114, 119 (1973); *accord State ex rel. Department of Human Services v. Jojola*, 99 N.M. 500, 660 P.2d 590 (1983), *appeal dismissed, cert. denied, Jojola v. New Mexico*, 464 U.S. 803, 104 S.Ct. 49, 78 L.Ed.2d 69 (1983). We recognize, as we did in *D.L.L.*, that simply being off the reservation is not enough in itself to give the state court jurisdiction over an Indian off the reservation. Nevertheless, when an Indian leaves the reservation and establishes a new domicile, a situation significantly different from *Lee* arises. Under these circumstances, the tribal sovereignty that the court in *Lee* sought to protect is no longer threatened. In *Lee*, repeated reference was made to the fact the dispute involved only *reservation* Indians and took place entirely upon the reservation. Indeed, the Court explained that state jurisdiction was not to "undermine the authority of the tribal courts over *Reservation affairs* [.]" *Lee, supra,* 358 U.S. at 223, 79 S.Ct. at 272, 3 L.Ed.2d at 255 (emphasis added).

The circuit court's exercise of jurisdiction in this case relates to matters beyond the reservation. Once Dolly left the reservation and took up residence in Rapid City, the state acquired an interest in the marriage of Dolly and William, and their divorce can no longer be characterized exclusively as a "reservation matter." Contrary to William's argument, all the operative facts of this case did not occur solely on the reservation. A marriage is not a single transaction or occurrence, but is an ongoing relationship that continues until the marriage is terminated. Once Dolly left the reservation, operative facts continued to arise off the reservation.

William fails to explain how the Crow Creek tribe's right to govern themselves would be infringed by the circuit court's exercise of jurisdiction in this matter. The Crow Creek tribe is not denied the ability to enact its own laws governing divorce and to enforce those laws in its own courts. In fact, under SDCL 1–1–25, we are bound to recognize a proper tribal court divorce. However, without a proper tribal court divorce, the state court is merely exercising its own concurrent jurisdiction over the marriage of one of its domiciliaries. William offers no authority that a tribal court is to have exclusive jurisdiction over any Indian divorce, regardless of the parties' domiciles. Just as South Dakota does not retain exclusive jurisdiction over the marriage of South Dakota citizens who leave the state, the tribe does not retain exclusive jurisdiction over the marriage of its members who leave the reservation. We see no reason to grant the Crow Creek tribe greater sovereignty than our constitution grants to any of our sister states.

■ When a citizen of another state moves to South Dakota and becomes domiciled here, the state is empowered to exercise jurisdiction over that individual's marriage. Such action does not impermissibly interfere with the sovereignty of the other state. In fact, in *Williams I*, it was argued that if divorce decrees must be given full faith and credit by other states, "a substantial dilution of the sovereignty of other states will be effected." 317 U.S. at 302,

63 S.Ct. at 215, 87 L.Ed. at 288. The Court rejected the argument and explained that "[s]uch is part of the price of our federal system." *Id.* Accordingly, we conclude that when one spouse is domiciled off the reservation a state court may entertain a divorce action without infringing upon tribal sovereignty.

William cites numerous cases from other jurisdictions where courts refused to decide Indian domestic relation matters for lack of subject matter jurisdiction. *E.g., Fisher v. District Court of Sixteenth Judicial District,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Martinez v. Superior Court, County of La Paz,* 152 Ariz. 300, 731 P.2d 1244 (Ct.App.1987); *In re Marriage of Limpy,* 195 Mont. 314, 636 P.2d 266 (1981); *Whyte v. District Court of Montezuma County,* 140 Colo. 334, 346 P.2d 1012 (1959); *State ex rel. Stewart v. District Court of Thirteenth Judicial District,* 187 Mont. 209, 609 P.2d 290 (1980); *Byzewski v. Byzewski,* 429 N.W.2d 394 (N.D.1988). However, all of these cases differ from *Wells* in one significant way—*all* the Indian parties were domiciled on a reservation.* Unquestionably, in such a situation a state court would lack subject matter jurisdiction, but such is not the case here. Dolly is domiciled off the reservation in Rapid City.

We do not consider questions of jurisdiction concerning custody, or child or spousal support. Those issues have not been raised in the trial court. In this respect, William's petition for intermediate appeal may have been premature. We affirm the trial court order and remand for further proceedings.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

HENDERSON, J., concurring in result.

HENDERSON, Justice (concurring in result).

In *Application of Defender,* 435 N.W.2d 717 (S.D.1989), this Court was in sync with my dissent in *State ex rel. Joseph v. Red Wing,* 429 N.W.2d 49 (S.D.1988). For an insightful, academic review of the *Red Wing* decision and the recognition of the correctness of this writer's dissent in *Red Wing* see Case Comment, Walz *State ex rel. Joseph v. Red Wing:* A Dictionary Definition Rationale for the Infringement of Tribal Self–Government, 34 S.D.L.Rev. 701 (1989).

In *Red Wing,* the tribal court had inceptual jurisdiction and never lost it.

In *Defender,* the tribal court did not have jurisdiction inceptually and therefore, I could join *Defender* retaining my conviction that tribal courts in South Dakota must be recognized as valid courts of law. Here, in *Wells,* I can join the majority without abandoning my position in *Red Wing* because the tribal court patently violated its own rules; and thereby, no valid service was effectuated upon the wife. Succinctly, a tribal judge cannot change a tribal code. Thus, the tribal court did not obtain jurisdiction.

My vote, to concur in result, is filled with conceptual trepidation. There is a danger to the very existence of the tribal courts (in this State) if this State Supreme Court "goes behind" a tribal court's decree. Question: How far can this Court search to determine if personal service has been effectuated under the tribal code? We, as a sovereign Supreme Court cannot—should not, place ourselves in a position of acting as a reviewing court, if, in effect, this Court would be holding that there was no in personam jurisdiction vested in the tribal court. How far can this Court go in piercing a tribal decree? As we on this Court probe into a tribal decree, when do we pass the line where we are reviewing procedural niceties? Truly, I do not believe we are reviewing a procedural nicety of the Crow Creek Tribe, but rather, are saying that we cannot grant comity under *Mexican* be-

---

* In *Byzewski,* the non-Indian husband was served with domestic relation papers on the reservation. The next day, he moved off the reservation and started a state court divorce action. The court held there was subject matter jurisdiction to decide the divorce action, but not child custody and support matters.

cause there is no clear and convincing evidence that the Crow Creek Tribal Judgment complied with its own laws. The error is so patent, i.e., no personal service, that there was no valid jurisdiction. In my opinion, we have not judicially bushwacked the sovereignty of the Crow Creek Tribe. This, I would be very much opposed to and especially in domestic relations, as exemplified by our shining rationale *In re Guardianship of D.L.L. and C.L.L.*, 291 N.W.2d 278, 281 (S.D.1980). This unanimous decision was written by my esteemed colleague, Justice Francis Dunn, a former Chief Justice of this Court. We have only two members left of the *D.L.L.* and *C.L.L.* Court, Senior Justice Robert Morgan and this author. Three members of this Court were appointed to this Court by the Honorable William Janklow, Governor. The *D.L.L.* and *C.L.L.* Court had as its Chief Justice, the Honorable Roger Wollman, who now sits on the Eighth Circuit Court of Appeals with its principal office at St. Louis, Missouri. The Wollman Court through Justice Dunn, expressed:

> The fact that the children in this case spent some time off the reservation is not determinative of the proper forum. Even though a member of an Indian tribe may be outside the territorial boundaries of the reservation, the tribal government may regulate the absent member's affairs involving questions of membership, *Roff v. Burney*, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897), and questions of domestic relations.

I agree with the observation of Federal Judge Bogue when he observed in *Cheyenne River Sioux Tribe v. Kleppe*, 424 F.Supp. 448 (D.S.D.1977), "... All too often, courts seem to pay little more than lip service to the right and power of Indian peoples to govern themselves." We do not have subject matter jurisdiction over disputes in domestic relation cases of Indian people and we must zealously guard against any type of creeping encroachment thereon. *See, generally, Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943 (1976). If state court jurisdiction on Indians or activities on Indian land would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law. The United States Supreme Court in *Iowa Mutual Ins. Co. v. LaPlante et al.*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) declared, inter alia, "We have repeatedly recognized the Federal Government's long standing policy of encouraging tribal self-government ... Tribal courts play a vital role in tribal self-government (citation omitted), and the Federal Government has consistently encouraged their development." There is broad and expansive language in the majority opinion which greatly troubles me, example: "... once Dolly left the reservation operative facts continued to rise off the reservation." Perhaps Dolly can establish a domicile off the reservation; this does not mean that the "operative facts" which happened on the reservation are not material nor, perhaps, governing. It would be wrong, in my opinion, to thwart settled law in this nation to honor a domicile and thus establish state jurisdiction simply because a party stepped across the reservation boundary line. A bona fide domicile would have to be established in the geography governed by the State. Dolly apparently lived off the reservation some four months before she started a divorce in the state court. It is obvious that *most* of the operative fact took place on the reservation. After all, the parties had lived on the reservation for approximately seven years. Each set of facts will have to be scrupulously scrutinized to preclude state courts from infringing on sovereign tribal rights. A court must reach a decision so as not to frustrate the Indian Civil Rights Act of 1968. This law came about as the result of an amendment to Public Law 280, by 82 Statutes 78 (25 U.S.C. §§ 1321–26).

This case is far closer than the majority would lead us to believe. The parties, and all of their children, are enrolled members of the Crow Creek Sioux Tribe and lived their entire married life on the Crow Creek Reservation. Appellant William Wells, all during this litigation, continued to reside on the Crow Creek Reservation. The majority writer would attempt to influence the

reader by emphasizing the word "County" in the writing to suggest that somehow, someway this makes quite a difference. If any reader takes out a map and studies the reservations of this State, it will be readily determined that *all* reservations fall within the geographic confines of a "County." This does not mean that the tribes on the reservations within the counties are under state jurisdiction. Land within the limits of any Indian Reservation under jurisdiction of the United States Government is in Indian country. 18 U.S.C. § 1151. Can there be any greater threat to tribal relations and to the tribal power of self government when state court systems interfere in questions of tribal domestic relations? In *United States v. Quiver*, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916) it was held that the unilateral act of one party in abandoning a domicile on the reservation does not alone create state court jurisdiction that would otherwise not exist, said court further holding that matters of domestic relations among tribal members is exclusively within the jurisdiction of the tribal court. In *Red Wing*, I expressed that Indians know about Indians; that they know their history; and they understand their own cultural heritage. Reservations have a historical anomaly in that they are within the political boundaries of the State (and obviously, counties). There can be no doubt that Appellant William Wells was a resident of the Crow Creek Reservation and had no nexus with South Dakota.

Lastly, I wish to refer to South Dakota Indian Jurisdiction 11 S.D.L.Rev. 101 (1966) by Walz. I also draw upon *State v. Onihan*, 427 N.W.2d 365 (S.D.1988) and *Rosebud Sioux Tribe et al. v. the State of South Dakota et al.*, United States District Court for the District of South Dakota, Federal Judge Donald Porter presiding which was decided March 19, 1989. South Dakota has long danced with Public Law 280. It has unsuccessfully attempted to conditionally or partially assume civil and criminal jurisdiction over Indians and Indian territory. *See, In re High Pine*, 99 N.W.2d 38 (S.D.1959). Said decision overruled Chapter 391 of the Session Laws of 1957 which gave South Dakota criminal and civil jurisdiction over Indian land. Another key decision in this Court is *In re Hankin's Petition*, 125 N.W.2d 839 (S.D. 1964). In *Hankins*, chapter 464 of the Session Laws of 1961 was ruled inconsistent with the congressional purposes of Public Law 280. There has been a historic struggle by the State Legislature with the Congress of the United States to acquire, in one fashion or the other, state jurisdiction to supplant inherent tribal sovereignty. In the end, the Crow Creek Tribe has a right to make and enforce its own laws subject only to the will of Congress. The members of this Court cannot manifest a power, by broad language, to carte blanche assume jurisdiction over controversies between the Indians exclusively arising within the borders of their own reservation. Hearken unto the words of a unanimous United States Supreme Court decision, *United States v. Mazurie*, 419 U.S. 544, 556, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975), reversing a 1973 Tenth Circuit Court decision as found at 487 F.2d 14. Speaking through Justice Rehnquist the highest court of this land stated:

> This Court has recognized limits on the authority of Congress to delegate its legislative power.... Those limitations are, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter ... Thus, it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, they are a 'separate people,' possessing 'the power of regulating their internal and social relations ...'

*Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

### Year of Reconciliation

As I pen my legal thoughts, a wave of legal concern comes upon my spirit. For over one decade, I have attempted to recognize the Indian community's struggle for social and governmental autonomy, as well as justice for our Red Brothers in this State's courts. *State v. Chief Eagle*, 377

N.W.2d 141 (S.D.1985), Henderson, J., dissenting. Comity and mutual respect to the decisions of tribal courts has been a long time message of mine. *Mexican.* I have in the past, and now, recognize that in South Dakota we have tribal and state court systems. As found in the 1990 Legislative Senate Journal (pg. 60, 2nd legislative day), our present Governor has declared this year to be a Year of Reconciliation, requesting Indians and non-Indians to come closer together. Our Governor has asked us to set goals, to make strides toward better understanding in 1990. He is quoted in an article on page 2 of the Rapid City Journal, January 12, 1990 as follows: "The end result should not only be fun, but mutual respect and trust." Chairperson, Judy Petersen, who acts as the "Chairman" of the Flandreau Sioux Tribe, observed that the gathering should go beyond pure enjoyment. Governor Mickelson thus appeared before the State Indian Affairs Commission on January 11, 1990 in an attempt to bring together the Indian and white community in a spirit of friendship. *Id.* pg. 1.

On February 1, 1990, Governor Mickelson and representatives of eight of the state's nine Sioux Tribes began what has now been called the "Year of Reconciliation." The Governor sat cross-legged on the floor of our State Capitol rotunda and shared a peace pipe with these Sioux representatives. Filled with legislators, state and tribal officials, the rotunda rang out with traditional Indian songs honoring the Indian people and expressing a hope for peace. *See,* Rapid City Journal, pg. 1, February 2, 1990.

This is the beginning of the second century of South Dakota statehood. It is good that Indians and whites now seek a year of racial understanding and a new beginning of peace with one another.

Alas, but hopefully only for a moment, as the tide of understanding ebbs and flows, South Dakotans read, via a February 3, 1990, Rapid City Journal article that our Governor has said: "We're not going to solve jurisdictional issues." He also expressed that jurisdictional disputes could not be settled by the State and tribes and should not be part of the 1990 Reconciliation effort. Disappointment was expressed by the Chairman of the Cheyenne River Sioux Tribe who observed that the gatherings should go beyond pure enjoyment thereof indicating that: "If he's (the Governor) not interested in jurisdictional things and the issues that are really tearing us apart, there is no sense trying to pull this thing together. It's rhetoric." However, other tribal leaders took a more positive approach after the reconciliation ceremony. Increased understanding by the non-Indians and Indians could bring about help and economic development, health care and education for Indian people, they asserted.

A deep wound exists in the State of South Dakota by virtue of jurisdictional disputes between tribal courts and state courts. The Indians tell us that their inherent sovereignty pre-dates the Constitution of the United States. They want to decide cases, within tribal courts, which involve their people and their children. State court actions which undermine the authority of tribal courts are an impermissible infringement upon the right of tribal self government. *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 272. Let us, in the Year of Reconciliation, pursue all avenues of peace to include open-minded solutions to jurisdictional conflict between the Indians and non-Indians of this state.