JUSTICE NELSON
specially concurring in part and dissenting in part.
¶75 I concur with the majority that a district court, prior to assuming jurisdiction over a child custody proceeding when such jurisdiction is shared concurrently with a tribal court, must conduct an inquiry based on the factors enumerated in the majority opinion to determine whether the court should accept or decline to exercise that jurisdiction. Furthermore, I agree that in the case at bar the District Court record is unclear as to the residency of both Stacey and *430 Kinsey. In this regard, due to the importance, complexity and sensitivityof this case, I concur with the majority’s decision to remand this case to the District Court to determine Stacey’s and Kinsey’s residence at the time Shane filed a petition for dissolution with the District Court. However, because this dissolution involves both an Indian parent and a non-Indian parent who has never resided on the Reservation as well as a child who shares each parent’s heritage, I disagree with the majority that Stacey’s and Kinsey’s residence either on or off the Reservation is determinative of whether the Tribal Court has exclusive or concurrent subject matter jurisdiction. Rather, I would conclude that regardless of Stacey’s and Kinsey’s residence on or off the Fort Peck Reservation, the District Court and the Fort Peck Tribal Court share concurrent jurisdiction in this case. Consequently, the District Court should consider Stacey’s and Kinsey’s residence as only one of the many factors set forth in the majority opinion to determine which court would provide the most appropriate forum for determining Kinsey’s custody, and, therefore, which court should exercise jurisdiction. Upon this basis, I respectfully dissent.
¶76 The express exclusion of divorce proceedings from the ICWA’s coverage illustrates Congress’ intent that state and tribal courts should share concurrent jurisdiction over Indian child custody proceedings arising within a divorce proceeding between an Indian parent and a non-Indian parent. As the Fourth Circuit Court of Appeals stated:
This statutory exclusion clearly indicates that a state court may lawfully award custody of an Indian child to a non-Indian parent in a divorce proceeding. The [ICWA] does not confer exclusive jurisdiction on either a tribal court or a state court to award custody of children in a divorce proceeding. Rather, the [ICWA] discloses that Congress recognized that there can be concurrent jurisdiction in state and tribal courts.
Larch, 872 F.2d at 69 (comparing Sanders v. Robinson (9th Cir. 1988), 864 F.2d 630, 633, cert. denied, 490 U.S. 1110, 109 S.Ct. 3165, 104 L.Ed.2d 1028 (1989)). Consideration of other case law leads to the same conclusion.
¶77 We acknowledge the exclusivity of tribal jurisdiction over dissolution actions involving tribal members residing on the reservation. See Wellman, 258 Mont. at 135-36, 852 P.2d at 562 (citing Limpy, 195 Mont. 314, 636 P.2d 266 and Stewart, 187 Mont. 209, 609 P.2d 290). Compare Fisher, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (holding that a tribal court exercised exclusive jurisdiction over a *431 child custody dispute wherein all the parties were enrolled members residing on the reservation). However, once a dissolution action involves a non-Indian party and/or one of the parties resides off the reservation, tribal jurisdiction is no longer considered exclusive. For example, in Wellman, a tribal member brought a dissolution action in state court against her non-Indian husband, although they both resided on the Blackfeet Reservation. We noted, in dicta, that “[n]o precedent suggests that in such a case the Blackfeet Tribal Court has exclusive jurisdiction over the dissolution, or that exercise of concurrent jurisdiction by a state district court interferes with tribal self-government.” Wellman, 258 Mont. at 136, 852 P.2d at 562. See also Sanders, 864 F.2d 630, 633 (without reaching the question of exclusive tribal jurisdiction, the Ninth Circuit explained that the tribal court had at least concurrent but not necessarily exclusive jurisdiction over a divorce action brought by an Indian against a non-Indian, both of whom resided on the reservation).
¶78 Similarly, the South Dakota Supreme Court has determined that once a divorce case no longer involves two tribal members residing on the reservation, the state and tribal courts exercise concurrent subject matter jurisdiction. See Wells v. Wells (S.D. 1990), 451 N.W.2d 402. In Wells, an off-reservation Indian wife brought a divorce action in state court against her Indian husband who resided on the reservation. The Court determined that the state and tribal courts exercised concurrent jurisdiction over this divorce action. Wells, 451 N.W.2d at 405-06. Under the Williams infringement test, the court determined that once the wife resided off the reservation, the state acquired an interest in the marriage and the divorce was no longer exclusively a “reservation matter.” Wells, 451 N.W.2d at 405. By adjudicating the case, the state court was only exercising its own concurrent jurisdiction and the tribe was not denied the right to make and enforce its own laws. Wells, 451 N.W.2d at 405. Compare Bertelson, 189 Mont. at 537, 617 P.2d at 129 (“Indians who reside off the reservation, as a general rule have the same rights and responsibilities and are subject to the jurisdiction of state courts in the same manner as state citizens”) (citing Mescalero Apache Tribe v. Jones (1973), 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114).
¶79 In a subsequent case, the court explained that under this concurrent jurisdiction, the court which first obtained valid personal jurisdiction over the parties could adjudicate the case. Harris v. Young (S.D. 1991), 473 N.W.2d 141, 145. In Harris, the South Dakota Supreme Court determined that state and tribal courts share concur *432 rent jurisdiction over divorce actions between an Indian party domiciled on a reservation and a non-Indian party domiciled elsewhere within the state. Harris, 473 N.W.2d at 145. The court explained that concurrent subject matter jurisdiction in this case was even more compelling than in Wells because one of the parties was not an enrolled member of the tribe and had never been domiciled on the reservation. Harris, 473 N.W.2d at 145.
¶80 The court considered other factors in addition to who the parties were and where they lived to affirm the trial court’s exercise of jurisdiction. The court noted that the daughter involved in the case was not yet an enrolled member and that the tribal code allowed tribal courts to have jurisdiction over this type of suit only by stipulation of the parties. Harris, 473 N.W.2d at 145. The court said that these two factors showed that the assertion of state concurrent jurisdiction not only passed the Williams infringement test, but that it was “compelled” by the specific provisions of the tribal code. Harris, 473 N.W.2d at 145-46. Finally, the court said that because the Indian wife had previously used the state court system to restrain the non-Indian father from exercising his visitation rights, she could not now say that the state court lacked subject matter jurisdiction because it infringed on tribal sovereignty. The court considered her actions “opportunistic [and] self-serving ....” Harris, 473 N.W.2d at 146.
¶81 As seen from the cases discussed above, no precedent suggests that the Fort Peck Tribal Court would exercise exclusive jurisdiction even if the District Court finds on remand that Stacey and Kinsey resided on the Reservation at the time Shane filed for dissolution in District Court. Rather, these cases support a conclusion that the District Court and Tribal Court share concurrent jurisdiction. Clearly then, a finding by the District Court that Stacey and Kinsey did not reside on the Reservation at the time Shane filed for dissolution in District Court provides an even more compelling basis for the same conclusion.
¶82 Having concluded that the District Court and Tribal Court share concurrent jurisdiction in this action regardless of whether Stacey and Kinsey resided on or off the Reservation, I would also point out that, in addition to the factors enumerated in the majority opinion, the Fort Peck Tribal Code itself provides guidance as to which court properly exercised jurisdiction in the present action.
¶83 First, if the District Court determines that Stacey’s and Kinsey’s residence was off the Reservation, the Fort Peck Tribal Code itself would preclude the Tribal Court from exercising jurisdiction *433 over this divorce and child custody matter. Title VI, § 301 of the Fort Peck Tribal Code, grants the tribal court subject matter jurisdiction over divorce actions and related custody proceedings involving non-Indians only if certain prerequisites are met:
The Court shall have jurisdiction over annulment, divorce and any paternity, child custody, division of property, child support or alimony decree pursuant to such annulment or divorce, where at least one (1) party to the marriage is an Indian, and at least one (1) party has been a bona fide resident within the boundaries of the Fort Peek Reservation for a period of ninety (90) days immediately preceding the filing of the action. [Emphasis added.]
Here, the parties do not dispute that Shane resided off the Reservation; therefore, if the evidence shows that Stacey and Kinsey did not reside on the Fort Peck Reservation at the time Shane filed for dissolution in the District Court, jurisdiction of the Fort Peck Tribal Court would not be invoked because Stacey would fail to satisfy the requisite time period. On the other hand, if the evidence shows that Stacey and Kinsey did reside on the Reservation at the time Shane filed for dissolution in the District Court, the requirements of Title VI, § 301 of the Fort Peck Tribal Code would be satisfied and the Tribal Court could also exercise jurisdiction.
¶84 However, in the case at bar, Stacey never filed for dissolution in Tribal Court, and, consequently, she never invoked the court’s jurisdiction pursuant to Title VI, § 301 of the Fort Peck Tribal Code, and, therefore, her residency on or off the Reservation is immaterial. Rather, Stacey invoked the jurisdiction of the Tribal Court pursuant to Title VI, § 304a of the Fort Peck Tribal Code, by petitioning for custody of Kinsey after the District Court determined that Shane should be primary custodian. In response to Stacey’s petition, the Fort Peck Tribal Court exercised its jurisdiction and awarded her temporary custody the same day. Title VI, § 304a of the Fort Peck Tribal Code provides:
The Court shall have authority to determine custody of children as between parents and legal guardians, or as between parents or legal guardians and anyone with actual physical custody of the child, either pursuant to a court order or otherwise, where there is no divorce or annulment proceeding pending. [Emphasis added.]
¶85 Stacey’s invocation of the Tribal Court’s jurisdiction in this case was improper. Once dissolution proceedings are commenced within a *434 state district court, the state court has jurisdiction to make child custody determinations. Section 40-4-211, MCA. Additionally, Montana exercises continuing jurisdiction over child custody matters. See Bertelson, 189 Mont. at 534-35, 617 P.2d at 127 (citing Cobell v. Cobell (9th Cir. 1974), 503 F.2d 790, cert. denied, 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975)); Cobell, 503 F.2d at 795 (citing Barbour v. Barbour (1958), 134 Mont. 317, 330 P.2d 1093). Moreover, Title VI, § 304a of the Fort Peck Tribal Code, by its own terms, placed jurisdiction over Kinsey’s custody in the District Court because the state dissolution was already pending.
¶86 In this regard, not only did Stacey improperly petition the Tribal Court for child custody, but the Fort Peck Tribal Court improperly jumped into this case with its interim custody order while the District Court was still exercising jurisdiction. The point to be made is that while one sovereign’s courts are exercising jurisdiction, another sovereign’s courts should abstain until the forum court settles any attack upon its jurisdiction. Here, Stacey did the same opportunistic, self-serving thing condemned by the South Dakota Supreme Court in Harris. That is, Stacey happily used the District Court while things went her way, but abandoned the District Court in favor of the Tribal Court when it served her purposes to do so. This sort of unseemly, opportunistic forum shopping is antithetical to the principles of deference and stability that the majority opinion espouses. In fact, we condemned this very thing in Agri West v. Koyama Farms, Inc. (1997), 281 Mont. 167, 933 P.2d 808. If Montana courts are required to abstain from interfering in on-going tribal court litigation until the tribal court determines it lacks jurisdiction or until a higher court makes that determination, Agri West, 281 Mont. at 174, 933 P.2d at 812-13, then Montana courts and litigants have the right to expect) and do expect, the same deference from tribal courts. That is, they expect tribal courts to adhere to the same sort of abstention principle as adopted by the United States Supreme Court in National Farmers and Iowa Mutual. See Strate, 520 U.S. at_, 117 S.Ct. at 1410, 137 L.Ed.2d at 672.
¶87 The majority concludes that a tribal court has exclusive jurisdiction over “child custody proceedings between parents where at least one parent is an Indian and that parent resides on the reservation with an Indian child.” To support this conclusion, the majority relies primarily on the second exception to the general rule in Montana and on inapplicable statutory law as set forth in the UCCJA, the PKPA, and the ICWA. The majority justifies this conclu *435 sion by explaining that “[a]t its core, our decision to recognize exclusive jurisdiction for the tribal court in a child custody matter that involves an Indian child and at least one Indian parent who reside on the Reservation is based on the best interest of the child.”
¶88 Yet, “[o]ur case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances.” Strate, 520 U.S. at_, 117 S.Ct. at 1409, 137 L.Ed.2d at 670 (discussing Oliphant, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, and Montana, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493). Here, the majority strains to “give” tribal courts exclusive jurisdiction over nonmember parents in child custody proceedings involving Native American children by wedging inapplicable legislation, namely, the UCCJA, the PKPA and the ICWA, into the second Montana exception. That is, the majority awkwardly struggles to pound a square peg into a round hole. And, in doing so, they have destroyed the line separating judicial and legislative authority and have improperly legislated new law to effectuate the benevolent goal of ensuring that child custody placement as between parents is in the best interests of Indian children.
¶89 While I agree that in any child custody proceeding the best interests of the child standard should factor predominantly, I disagree that based on this reason alone, this Court should disregard the fundamental concept of separation of powers. Furthermore, I disagree that the best interests of the child standard should be used as the controlling principle to determine whether a court possesses subject matter jurisdiction over a child custody case as a matter of law. Rather, only after concluding that it possesses subject matter jurisdiction should a court use the best interests of the child standard as a controlling principle to determine whether to exercise that jurisdiction. See Bertelson, 189 Mont. at 538, 617 P.2d at 129.
¶90 Admittedly, we have previously looked to the policies of nonapplicable child custody statutes which incorporate the best interests of the child standard when reviewing a court’s decision to exercise subject matter jurisdiction over custody cases involving Native American children. See generally Bertelson, 189 Mont. at 533, 617 P.2d at . 126 (asserting that although the ICWA did not apply to the instant case, state courts should “respect federal policy and consider the rights of the child and the tribe in deciding whether to accept or to decline jurisdiction”) and Zier, 230 Mont. at 467, 750 P.2d at 1084 (commenting that the district court’s deferral of jurisdiction to the tribal court in a child custody matter promotes the purposes of the *436 UCCJA). However, to rely on nonapplicable child custody statutes which incorporate the best interests of the child standard, as the majority does, to determine as a matter of law whether a court possesses subject matter jurisdiction is again an entirely different matter. That is, by using the best interests of the child standard as a controlling principle to conclude that tribal courts possess exclusive subject matter jurisdiction over certain Indian child custody cases, the majority erroneously inserts a discretionary standard into a fundamental question of law. Nothing in our prior case law suggests that the majority’s current analysis and decision is appropriate. Moreover, the majority has adopted an interpretation and application of federal law here that is directly inapposite to the provisions of the law itself and renders this rationale and the decision which incorporates it subject to attack in the federal courts.
¶91 In its discussion of general tribal jurisdiction, the majority acknowledges the general rule of Montana that, subject to two exceptions, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within the reservation, absent different Congressional direction. Montana, 450 U.S. at 563-67, 101 S.Ct. at 1257-59, 67 L.Ed.2d at 509-11. However, the majority submits that the second exception to the general rule in Montana, recognizing tribal jurisdiction over nonmember reservation conduct that threatens or directly affects the tribe’s political integrity, economic security, health or welfare, applies in this case. To support the application of the second Montana exception here, the majority compares this case to Fisher, explaining that Fisher was cited as an example of the second Montana exception in both Montana and Strate. See Montana, 450 U.S. at 566, 101 S.Ct. at 1258, 67 L.Ed.2d at 511, and Strate, 520 U.S. at_, 117 S.Ct. at 1415, 137 L.Ed.2d at 678. With this comparison, the majority lays the foundation for the conclusion that when a child custody dispute between parents involves an enrolled member and that person’s child, both of whom reside within the exterior boundaries of the reservation, tribal jurisdiction must be recognized as exclusive to avoid causing a “decline in the authority of the Tribal Court.” See Fisher, 424 U.S. at 388, 96 S.Ct. at 947, 47 L.Ed.2d at 112.
¶92 However, Fisher is factually distinguishable from the case at bar, and, as such, the majority’s reliance on Fisher is misplaced. Fisher involved a pre-ICWA parental rights termination and adoptibn proceeding in which all the parties (the foster parents, biological mother, and Indian child) were members of the Northern Cheyenne Tribe and residents of the Northern Cheyenne Reservation. In recog *437 nizing the exclusive jurisdiction of the tribal court, the United States Supreme Court explained:
State-court jurisdiction plainly would interfere with the powers of self-government conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court. It would subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves. As the present record illustrates, it would create a substantial risk of conflicting adjudications affecting the custody of the child and would cause a corresponding decline in the authority of the Tribal Court.
Fisher, 424 U.S. at 388-89, 96 S.Ct. at 947, 47 L.Ed.2d at 112 (emphasis added).
¶93 Unlike in Fisher, the custody dispute in the case at bar does not involve a parental rights termination and adoption proceeding between enrolled Native Americans residing on the reservation; rather, it involves a custody dispute resulting from a dissolution proceeding between an Indian parent and a non-Indian parent. Furthermore, unlike in Fisher, the situation presently before us cannot be labeled exclusively as a “dispute arising on the reservation.” Here, Kinsey’s non-Indian father never resided on the Reservation. Therefore, even if Stacey did reside on the Reservation with Kinsey during the times she had physical custody, custody and visitation of Kinsey still were split between both parents and occurred both on and off the Reservation. Consequently, the holding in Fisher is distinguishable and fails to provide an avenue for including the present case within the second Montana exception, and, therefore, fails to support the majority’s ultimate conclusion that the Fort Peck Tribal Court had exclusive jurisdiction if Stacey and Kinsey did reside on the Fort Peck Reservation.
¶94 Next, the majority “analogizes] to the policy considerations of the UCCJA and the PKPA.” In doing so, the majority acknowledges that the definition of “state” used in the UCCJA and the PKPA does not specifically include Indian tribes-r Despite this, the majority characterizes the omission as “of no consequence to the policy-based analysis of the UCCJA and the PKPA that we engage here.” And with this disclaimer, the majority boldly states that “we will compare Indian tribes to territories within the meaning of the UCCJA and the PKPA definition of‘state.’ ” To support this comparison, the majority cites cases from other jurisdictions as well as our decision in Day, 272 Mont. 170, 900 P.2d 296.
*438 ¶95 Not only does our decision in Day fail to legitimize the majority’s comparison, but an opinion issued by the Ninth Circuit Court of Appeals, Wilson v. Marchington (9th Cir. 1997), 127 F.3d 805, sets forth an analysis showing the impropriety of such a comparison. In Marchington, the Ninth Circuit Court of Appeals concluded that principles of comity, not principles of full faith and credit, govern whether a district court should recognize and enforce a tribal court judgment. Marchington, 127 F.3d at 808. To reach this conclusion, the court noted that, by its own terms, the Full Faith and Credit Clause, Article IV, Section 1 of the United States Constitution, only applies to states. Marchington, 127 F.3d at 808. Furthermore, the court noted that the initial legislation implementing this constitutional clause, 28 U.S.C. § 1738, passed in 1790 and modified in 1804, was only modified to include territories and possessions. Marchington, 127 F.3d at 808. No where were Indian tribes referenced in either the constitutional clause or the implementing legislation. Marchington, 127 F.3d at 808.
¶96 The court considered many factors to conclude that Congress did not intend to include Indian tribes under the Full Faith and Credit Clause. Marchington, 127 F.3d at 808-09. First, the court pointed out that subsequent statutes, including the ICWA, 25 U.S.C. §§ 1901 et seq., expressly extended full faith and credit to certain tribal proceedings. Marchington, 127 F.3d at 809. The court concluded that such an inclusion would not have been necessary if full faith and credit had already been extended to the Indian tribes. Marchington, 127 F.3d at 809. Second, the court specifically noted that Congress’ separate listing of territories, possessions and Indian tribes in the ICWA indicated that Congress did not consider these terms as synonymous. Marchington, 127 F.3d at 809. Further, the court pointed out that if Congress intended to include Indian tribes under 28 U.S.C. § 1738, it could have either made specific reference to them in the 1804 amendments or made additional amendments to the statute after ambiguous judicial constructions surfaced. Marchington, 127 F.3d at 809. The court concluded:
Given this history, it would be imprudent of us to now construe the phrase “territories and possessions” in the 1804 statute to assume the meaning of the language Congress used in the Indian Child Welfare Act (“every territory or possession of the United States, and every Indian tribe”) (emphasis added) and the Indian Land Consolidation Act.
*439 Certainly, there are policy reasons which could support an extension of full faith and credit to Indian tribes. Those decisions, however, are within the province of Congress or the states, not this Court. Full faith and credit is not extended to tribal judgments by the Constitution or Congressional act, and we decline to extend it judicially.
Marchington, 127 F.3d at 809.
¶97 We have previously recognized the distinction expressed in Marchington. See Wippert v. Blackfeet Tribe (1982), 201 Mont. 299, 304, 654 P.2d 512, 515 (holding that “[t]ribal court judgments are treated with the same deference shown decisions of foreign nations as a matter of comity”). See also Day, 272 Mont. 170, 900 P.2d 296. Contrary to the implication created by the majority’s citation to Day that the majority’s comparison of Indian tribes to territories within the definition of “state” as employed by the UCCJA and the PKPA is sound, our decision in Day did not arbitrarily include Indian tribes within the definition of “state” as set forth in the Full Faith and Credit for Child Support Orders Act, 28 U.S.C. § 1738B (1994) (Child Support Act). Rather, we employed the provisions of the Child Support Act in Day to resolve issues involving enforcement of tribal court child support orders because the Child Support Act expressly defined a “state” to include “Indian country,” and, therefore, the provisions of the Child Support Act expressly applied to Indian tribes. See Day, 272 Mont. at 175-77, 900 P.2d at 299-301 (citing 28 U.S.C. § 1738B(b)).
¶98 In Day, the Child Support Enforcement Division (CSED) brought an income withholding action in state district court against Day for satisfaction of past due child support payments based on a Fort Peck Tribal Court’s order modifying Day’s child support obligation. Day, 272 Mont. at 173-74, 900 P.2d at 298-99. We first considered the issue of whether the Fort Peck Tribal Code’s statute of limitations or Montana’s longer statute of limitations applied to the action. Day, 272 Mont. at 175-77, 900 P.2d at 299-301. Initially, we determined that the district court erred in applying the Uniform Foreign Money-Judgments Recognition Act (Recognition Act) to conclude that under the Fort Peck Tribal Code’s shorter statute of limitations the action was time-barred. Day, 272 Mont. at 174, 900 P.2d at 299. We explained that the Recognition Act expressly excluded from its coverage “judgments for support in matrimonial or family matters.” Day, 272 Mont. at 175, 900 P.2d at 299 (citing § 25-9-602(1), MCA). Furthermore, based on the applicability of the Child Support Act as indicated *440 by its express inclusion of Indian tribes within its definition of “state,” we concluded that Indian tribes were excepted out of the definition of “foreign states” under the provisions of the Recognition Act as well. Day, 272 Mont. at 175, 900 P.2d at 299 (citing § 25-9-602(2), MCA).
¶99 Accordingly, we turned to the governing federal Child Support Act to resolve the statute of limitations issue. The Child Support Act provided that in a child support enforcement action, “ ‘a court shall apply the statute of limitation of the forum State or the State of the court that issued the order, whichever statute provides the longer period of limitation.’ ” Day, 272 Mont. at 175, 900 P.2d at 300 (quoting 28 U.S.C. § 1738B(g)(3)). Therefore, following the directive of the Child Support Act, we held that Montana’s longer statute of limitations applied, and, consequently, CSED’s action against Day was not time-barred. Day, 272 Mont. at 176-77, 900 P.2d at 300.
¶ 100 We next considered the issue of whether CSED could enforce a tribal court child support order without initiating an action in a state district court. Day, 272 Mont. at 177-79, 900 P.2d at 301-02. We again concluded that “[s]ince Indian tribes are deemed ‘states’for the purposes of child support orders under the federal Child Support Act, Montana’s Child Support Enforcement Act [, Title 40, Chapter 5, part 4, MCA,] may be employed in the instant case as well.” Day, 272 Mont. at 178, 900 P.2d at 301. Accordingly, we held that Montana’s Child Support Enforcement Act could be employed as one alternative to initiating a state court action to enforce tribal court child support orders. Day, 272 Mont. at 178, 900 P.2d at 301-02.
¶101 Just as in Wippert and Day, the distinction made in Marchington should be recognized and followed in this case. See Marchington, 127 F.3d at 808-09. As the majority concedes, neither the UCCJA nor the PKPA specifically include Indian tribes within the definition of “state,” and, therefore, these statutes do not apply to the case at bar. Furthermore, even if applicable, the statutory provisions of the UCCJA and the PKPA were not intended to confer subject matter jurisdiction on a court, but rather only control when a court should exercise that jurisdiction. See §§ 40-7-102, -104; 28 U.S.C. § 1738A(f). See generally Harris, 473 N.W.2d at 143 (explaining that “the UCCJA assumes, but does not create, subject matter jurisdiction”) and Shupe, 276 Mont. at 413-15, 916 P.2d at 746-48. Consequently, it is axiomatic that these statutory provisions should not be used to determine the existence and character of subject matter jurisdiction exercised by either the state or tribal courts.
*441 ¶102 Furthermore, in addition to considering the policies of the UCCJA and the PKPA-, the majority relies heavily on the ICWA to conclude that the tribal court should exercise exclusive jurisdiction over child custody proceedings between parents involving an enrolled parent who resides on the reservation with the Indian child. This, too, is improper. The ICWA excludes from coverage “a placement based ... upon an award, in a divorce proceeding, of custody to one of the parents.” 25 U.S.C. § 1903(1). As the Bureau of Indian Affairs (BIA) commented in its guidelines for state courts:
Child custody disputes arising in the context of divorce or separation proceedings or similar domestic relations proceedings are not covered by the [ICWA] so long as custody is awarded to one of the parents.
The entire legislative history makes it clear that the [ICWA] is directed primarily at attempts to place someone other than the parent or Indian custodian in charge of raising an Indian child— whether on a permanent or temporary basis.
44 Fed. Reg. 228 (1979) at 67587. Many other jurisdictions share the view that, based on the express exclusion of divorce proceedings from the ICWA’s definition of “child custody proceeding,” the ICWA does not apply to child custody matters connected with divorce proceedings. See Matter of Custody of K.K.S. (Minn.App. 1993), 508 N.W.2d 813, 816; In re Custody of Sengstock (Wis.App. 1991), 477 N.W.2d 310, 312-13; Harris, 473 N.W.2d at 143 (citing Application of Defender (S.D. 1989), 435 N.W.2d 717, 721-22); In re Crystal K. (Cal.App. 3 Dist. 1990), 276 Cal.Rptr. 619, 622-24, cert. denied, 502 U.S. 862, 112 S.Ct. 183, 116 L.Ed.2d 144 (1991); Marriage of Baisley (Colo.App. 1987), 749 P.2d 446, 449, cert. denied, 488 U.S. 917, 109 S.Ct. 274, 102 L.Ed.2d 262 (1988); and Malaterre v. Malaterre (N.D. 1980), 293 N.W.2d 139, 145. See also DeMent v. Oglala Sioux Tribal Court (8th Cir. 1989), 874 F.2d 510, 514 and Larch, 872 F.2d at 69.
¶103 The majority acknowledges that the ICWA expressly excludes custody disputes arising from a marriage dissolution award. However, the majority states that “[r]egardless of its literal nonapplication to the facts before us, we cannot ignore the fact that the ICWA ‘evinces an emphatic federal policy of protecting the tribal role in proceedings involving Indian children.’ ” In fact, the majority pronounces that “we appreciate that in terms of our jurisdiction analysis, any disregard for the clear policy behind the ICWA preferences for a *442 tribal determination instead of a state determination would at least in part provoke a ‘decline in the authority of the Tribal Court.’ ” In other words, the majority requires district courts to apply the provisions of the ICWA to dissolution proceedings involving custody disputes over Native American children regardless of the fact that the ICWA itself expressly excludes these proceedings from its coverage.
¶[104 Certainly here, as in Marchington, tempting policy reasons exist (namely, the best interests of the child standard) to support the application of the policies underlying the UCCJA, the PKPA and the ICWA, to conclude that tribal jurisdiction should be exclusive. However, by applying these policies, the majority has unnecessarily invaded the province of the legislature. Article III, Section 1 of the Montana Constitution provides:
The power of the government of this state is divided into three distinct branches — legislative, executive and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.
¶105 Correspondent with this separation of powers clause is the statutory rule of construction that “the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.” Section 1-2-101, MCA. Simply put, the duty of the Supreme Court in interpreting a statute “is not to enact, but to expound, the law ....” Clark v. Olson (1934), 96 Mont. 417, 432, 31 P.2d 283, 288. As we have long stated, “ ‘[i]t is the duty of this court to construe the law as it finds it.’ ” State ex rel. Durland v. Board of County Comm’rs (1937), 104 Mont. 21, 24, 64 P.2d 1060, 1062 (quoting Montana Beer Retailers Protective Ass’n v. State Bd. of Equalization (1933), 95 Mont. 30, 34, 25 P.2d 128, 130).
“Statutes should be their own interpreter. Courts must look at the language used, and the whole of it, and derive therefrom the intention of the legislature. Where this intention is obvious there is no room for construction. When the language is plain, simple, direct and without ambiguity, the Act construes itself, and courts must presume the legislature intended what it plainly says. It is only in the case of ambiguous, doubtful and uncertain enactments that the rules and principles of interpretation can be brought into requisition. It is not allowable to interpret what has no need of interpretation.”
*443 Durland, 104 Mont. at 24-25, 64 P.2d at 1062 (quoting Smith v. Williams (1874), 2 Mont. 195, 198).
¶ 106 While this canon of construction is modified in federal Indian law to resolve doubtful expressions of legislative intent in favor of Native Americans, this modified canon also “does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.” South Carolina v. Catawba Indian Tribe, Inc. (1986), 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490, 498. In other words, “ ‘[a] canon of construction is not a license to disregard clear expressions of tribal and congressional intent.’ ” Catawba Indian Tribe, 476 U.S. at 506 n. 16, 106 S.Ct. at 2044 n.16 (quoting DeCoteau v. District County Court (1975), 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300, 315). As the First Circuit Court of Appeals aptly explained before concluding that Maine was not subject to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, 18 U.S.C. §§ 1166-1168 (IGRA), because Congress did not expressly apply the IGRA to Maine as required by the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1721-1735:
The rule of construction [regarding the resolution of ambiguous statutory language in favor of Native Americans] to which the Tribe alludes reflects a strong federal interest in safeguarding Indian autonomy. But the rule is apposite only when Congress has blown an uncertain trumpet. If ambiguity does not loom, the occasion for preferential interpretation never arises. When as now, Congress has unambiguously expressed its intent through its choice of statutory language, courts must read the relevant laws according to their unvarnished meaning, without any judicial embroidery. So it is here: since there is no statutory ambiguity, the principle of preferential construction is not triggered.
Passamaquoddy Tribe v. State of Maine (1st Cir. 1996), 75 F.3d 784, 793 (citing Rosebud Sioux Tribe v. Kneip (1977), 430 U.S. 584, 586-87, 97 S.Ct. 1361, 1362-63, 51 L.Ed.2d 660; Catawba Indian Tribe, 476 U.S. at 506, 106 S.Ct. at 2044, 90 L.Ed.2d 490; and Rhode Island v. Narragansett Indian Tribe (1st Cir. 1994), 19 F.3d 685, 691, cert. denied, 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994)). See also Rumsey Indian Ranchería of Wintun Indians v. Wilson (9th Cir. 1994), 64 F.3d 1250, 1257 (holding that “although statutes benefitting Native Americans generally are construed liberally in their favor, we will not rely on this factor to contradict the plain language of a statute”). Compare Marchington, 127 F.3d at 809 (declining to judicially extend full faith and credit to tribal court judgments when *444 neither the Constitution nor Congress had done so, despite the existence of policy reasons supporting such an extension).
¶107 Consequently, because the statutory provisions of the UC-CJA, the PKPA, and the ICWA, by their own terms, are inapplicable to the case at bar, the majority’s application of these provisions to justify “giving” tribal courts exclusive jurisdiction over nonmember parents in child custody proceedings involving Native American children creates improper judicial legislation. Such an imprudent violation of the constitutional prohibition against courts exercising legislative power could easily be avoided while still compelling the recognition of the best interest of the child standard simply by recognizing that the state and tribal courts share concurrent jurisdiction in these child custody matters and admonishing state courts to carefully consider, on a case by case basis, whether such jurisdiction should be assumed using the factors enunciated in the majority opinion.
¶108 Recognition of concurrent jurisdiction would allow us to follow the more flexible inquiry described in Bertelson in all interparental child custody disputes involving Native American children. That is, “[t]he matter could be more rationally approached as a question of restraint on the part of state courts in the exercise of jurisdiction, rather than an absolute absence of authority.” Barbara Ann Atwood, Fighting Over Indian Children: The Uses and Abuses of Jurisdictional Ambiguity, 36 U.C.L.A. L. Rev. 1051, 1104(1989). Such an approach would not only respect the parens patriae role of both the state and the tribe, but would also acknowledge each forum’s competence in determining whether exercise of its own jurisdiction would serve the best interest of the Indian child. Not to mention that such an approach in child custody matters would also encourage the cooperation between state and tribal courts overall.
¶109 Therefore, I would affirm the District Court’s conclusion that the State Court and Tribal Court share concurrent jurisdiction over this matter without regard to whether Stacey and Kinsey resided on or off the Reservation. However, I would remand this case to the District Court for consideration of the factors in Bertelson and those set forth in the majority opinion to determine whether to accept or decline to exercise concurrent jurisdiction in this action.
JUSTICE GRAY joins in the foregoing specially concurring and dissenting opinion.